```
1              IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                        AT CHARLESTON

3   _____x
                                   :
4   UNITED STATES OF AMERICA,      :  CRIMINAL ACTION
                                   :
5              Plaintiff,          :  NO. 2:20-mj-00013
                                   :
6              -vs-                :
                                   :
7   NEDELTCHO VLADIMIROV,          :
                                   :
8              Defendant.          :
    _____x
9
```

**TRANSCRIPT OF PRELIMINARY AND DETENTION HEARING**
**BEFORE THE HONORABLE DWANE L. TINSLEY,**
**UNITED STATES MAGISTRATE JUDGE**
**FEBRUARY 13, 2020**

**APPEARANCES:**

| | |
|---|---|
| **FOR THE PLAINTIFF:** | **AUSA ANDREW J. TESSMAN** |
| | Assistant United States Attorney |
| | U.S. Attorney's Office |
| | P.O. Box 1713 |
| | Charleston, WV  25326-1713 |

| | |
|---|---|
| **FOR THE DEFENDANT:** | **AFPD RACHEL E. ZIMAROWSKI** |
| | Assistant Federal Public Defender |
| | Federal Public Defender's Office |
| | 300 Virginia Street, East |
| | Room 3400 |
| | Charleston, WV 25301 |

Proceedings recorded by mechanical stenography from CourtSmart, transcript produced by computer.

_____
CATHERINE SCHUTTE-STANT, RDR, CRR
Federal Official Court Reporter
300 Virginia Street East, Room 6009
Charleston, WV 25301

```
 1                              INDEX

 2

 3     GOVERNMENT'S
       WITNESSES      DIRECT   CROSS   REDIRECT  RECROSS  EXAMINATION
 4
       TERRY HEDRICK      4      19       31       32          ^
 5
       JUSTIN GIBSON     38      40       44       45          ^
 6

 7

 8

 9     DEFENDANT'S
       WITNESSES      DIRECT   CROSS   REDIRECT  RECROSS  EXAMINATION
10
       (None)            ^       ^        ^        ^           ^
11

12

13

14     GOVERNMENT'S
       EXHIBITS            ADMITTED
15
       (None)
16

17

18     DEFENDANT'S
       EXHIBITS            ADMITTED
19
       (None)
20

21

22

23

24

25
```

*Catherine Schutte-Stant, RDR, CRR (304) 347-3151*

1              PROCEEDINGS had before The Honorable Dwane L.

2    Tinsley, United States Magistrate Judge, United States

3    District Court for the Southern District of West Virginia,

4    at Charleston, West Virginia, on February 13, 2020.

5              THE COURT:  Good afternoon.

6              MR. TESSMAN:  Good afternoon, Your Honor.

7              MS. ZIMAROWSKI:  Good afternoon.

8              THE COURT:  We are now here in the matter of

9    *United States of America versus Nedeltcho Vladimirov*, Case

10   Number 2:20-mj-00013.

11        Would counsel please note their appearances for the

12   record, please.

13             MR. TESSMAN:  Andrew Tessman appearing for the

14   United States.

15             THE COURT:  Mr. Tessman.

16             MS. ZIMAROWSKI:  Rachel Zimarowski on behalf of

17   Mr. Vladimirov.

18             THE DEFENDANT:  Yes.

19             MS. ZIMAROWSKI:  Thank you.

20             THE COURT:  All right.  Thank you, Ms. Zimarowski.

21        We're here today for a preliminary hearing and

22   detention hearing previously set by the Court.  First is the

23   preliminary hearing.

24        Ms. Zimarowski, are we taking evidence today or is the

25   defendant prepared to waive the preliminary hearing?

HEDRICK - DIRECT

```
 1                    MS. ZIMAROWSKI:  He's not waiving, Your Honor.

 2                    THE COURT:  All right.

 3              Mr. Tessman, are you ready to go forward?

 4                    MR. TESSMAN:  Yes, Your Honor.

 5              The United States calls Secret Service Agent Terry

 6   Hedrick to the stand.

 7                    THE COURT:  Agent Hedrick, if you'd come in front

 8   of Ms. Goodson to be sworn.

 9              TERRY HEDRICK, GOVERNMENT'S WITNESS, SWORN

10                    COURTROOM DEPUTY:  Thank you.  And have a seat in

11   the witness stand.

12                    THE COURT:  Mr. Tessman.

13                         DIRECT EXAMINATION

14   BY MR. TESSMAN:

15   Q.   Good afternoon.

16   A.   Good afternoon.

17   Q.   Could you state and spell your name for the record?

18   A.   Terry Hedrick, T-E-R-R-Y, H-E-D-R-I-C-K.

19   Q.   Where do you work, sir?

20   A.   For the U.S. Secret Service.

21   Q.   And what is your title?

22   A.   Special Agent.

23   Q.   How long have you been a Special Agent with the United

24   States Secret Service?

25   A.   For approximately 15 years.
```

1    **Q.**    What did you do before you were a Secret Service agent?

2    **A.**    15 years prior to that, I was a detective and a police

3    officer at Charleston Police Department, West Virginia, and

4    a Putnam County Sheriff.

5    **Q.**    What are your current duties with the Secret Service?

6    **A.**    As a Special Agent, we do a couple different missions

7    investigatively; we investigate financial fraud and then we

8    also protect the President and the Vice President of the

9    United States.

10   **Q.**    And what type of training did you receive for financial

11   investigations?

12   **A.**    So in financial investigations, between my time at the

13   Charleston and Putnam County and with the U.S. Secret

14   Service, investigating arranged financial fraud.  Currently,

15   I'm assigned to mainly bank fraud, any type of financial

16   fraud, computer fraud, and, again, threats against the

17   President.

18   **Q.**    Do you have experience in white collar investigation?

19   **A.**    I do.

20   **Q.**    And in the past couple years, how many investigations

21   have you been involved in?

22   **A.**    In the Northern and Southern District of West Virginia,

23   I'd say over 25 in the last couple years.

24   **Q.**    Have you been involved in the long-term investigation

25   into the defendant in this case, Nedeltcho Vladimirov?

1    **A.**    Yes, sir.

2    **Q.**    Do you see the defendant in the court here today?

3    **A.**    I do.

4    **Q.**    Could you point him out for us?

5    **A.**    The gentleman in the orange jumpsuit.

6              MR. TESSMAN:  Your Honor, let the record reflect

7    that the witness has identified the defendant.

8              THE COURT:  The record will so reflect.

9    BY MR. TESSMAN:

10   **Q.**    Is Mr. Vladimirov a U.S. citizen?

11   **A.**    He is.

12   **Q.**    Where is he from originally?

13   **A.**    Bulgaria.

14   **Q.**    Do you know when he became a naturalized citizen?

15   **A.**    I believe in the 2003-2004 timeframe.

16   **Q.**    What was the defendant being investigated for -- or

17   what is he currently being investigated for?

18   **A.**    It's a fraudulent scheme.  They call it a boosting type

19   of scheme.  Whereas in this case here, the defendant would

20   direct certain, in this case, low-level drug users, they

21   call them boosters, and he would request certain items from

22   them, whereas these boosters would go in and steal the items

23   from places like Target, CVS, Kroger's, different types of

24   stores similar to that.

25   **Q.**    Have you been working with other state and local

HEDRICK - DIRECT

1   agencies on this investigation?

2   **A.**   We have.   In this case, it was with the South

3   Charleston Police Department, the Putnam County Sheriff's

4   Office, the West Virginia State Police.

5   **Q.**   And have you also reviewed information provided by

6   what's called Organized Retail Investigators?

7   **A.**   Yes, retail investigators, corporate investigators with

8   Target, CVS, and Kroger's.

9   **Q.**   Can you explain how the investigation began?

10  **A.**   Yes.   So the retail investigators started tracking

11  thefts in this area, and there would be shoplifters

12  arrested, it would be the common shoplifter -- the same

13  shoplifter over and over.   And when these shoplifters were

14  being questioned, many times they would say they were --

15  they'd open up and frankly say they were stealing items that

16  they would in turn sell to Ned.

17  **Q.**   And by Ned, did your investigation lead you to conclude

18  that that was the defendant in this case?

19  **A.**   Correct.   Ned was later identified as the defendant

20  today .

21  **Q.**   And did the investigation reveal approximately how many

22  boosters that the defendant had working for him?

23  **A.**   Approximately 15 to 20 boosters.

24  **Q.**   Did the people who were apprehended at the retail

25  stores state that they received lists from Ned?

HEDRICK - DIRECT

1    **A.**    They would.  They would receive lists from Ned

2    requesting certain items, ranging from common household

3    goods, electronic products, vitamins, common goods like

4    that.

5    **Q.**    How much were they paid by the defendant?

6    **A.**    Approximately, just going from their statements and

7    stuff, sometimes -- approximately, between 30 to 50 percent

8    of the actual value of the product.

9    **Q.**    Did the people who were apprehended indicate what they

10   used that money for?

11   **A.**    They would simply use that -- it was a quick scheme for

12   them to get money to purchase drugs.

13   **Q.**    Did these retail investigators eventually approach

14   state and local authorities?

15   **A.**    They did.  After a certain point, they went -- I

16   believe the first agency they visited was South Charleston

17   Police Department and their detective bureau.

18   **Q.**    Did the investigators conduct surveillance of the

19   defendant in 2019?

20   **A.**    They did.  Once they contacted law enforcement in South

21   Charleston, in South Charleston and then eventually Putnam

22   County Sheriff's, they started providing surveillance on the

23   suspect.

24   **Q.**    Did they observe his routine?

25   **A.**    They did.

HEDRICK - DIRECT

1   **Q.**   And what type of car does the defendant drive?

2   **A.**   A black, older model BMW.

3   **Q.**   And did the surveillance reveal that the defendant

4   ships multiple packages per day?

5   **A.**   They did.  They would survey the -- or the boosters

6   meeting with Ned, say, at the Speedway in Cross Lanes, West

7   Virginia, they would provide Ned with a stolen item; they

8   would get paid; and then they would observe Ned going right

9   across the street to the United States Post Office and

10  actually shipping several boxes of what appeared to be

11  product.

12  **Q.**   Was the defendant observed meeting with people who were

13  known to be boosters and had previously been apprehended by

14  investigators?

15  **A.**   Yes.

16  **Q.**   Did the investigation eventually identify the

17  defendant's eBay account?

18  **A.**   They did.

19  **Q.**   And were the investigators able to contact eBay and, in

20  return, receive information about the defendant's eBay

21  account?

22  **A.**   Yes.  EBay provided information regarding the defendant

23  and his online sales and history .

24  **Q.**   Did they receive information for a two-year span?

25  **A.**   They did.

HEDRICK - DIRECT

1    **Q.**  And what was some of the information that they

2    received?

3    **A.**  So -- and going off memory and it's -- I believe the

4    information was obtained from October 2017 to October 2019,

5    it showed that Mr. Vladimirov had approximately $369,000 in

6    sales on eBay, with over -- approximately, 3,700 items sold.

7    **Q.**  Were the investigators able to correlate reports of

8    stolen items with the times that were listed on the

9    defendant's account?

10    **A.**  They did.  So they were able to correlate by monitoring

11    the eBay account certain stolen items.  So, say, if it was

12    Prevagen vitamins, within a day or two, they saw the

13    defendant had actually sold -- made a sale of Prevagen

14    vitamins on his eBay account.  And there were several other

15    examples like that, of a particular item from Target or from

16    CVS, and then within a day or two, the defendant had sold

17    that particular item on his account for a much larger price

18    than what he had purchased it for.

19    **Q.**  In January of this year, did the -- were there

20    controlled sales set up of this defendant?

21    **A.**  There was.  So just in the past couple of months, there

22    was controlled sales conducted by the detectives.

23    **Q.**  Can you explain what happened on January 23, 2020?

24    **A.**  So the first controlled sale was on January 23rd, where

25    a confidential informant with the Putnam County Sheriff's

HEDRICK - DIRECT

1    Office had contacted the defendant and told him that he had

2    a particular item.  And I believe in this case it might have

3    been electric razors, Norelco, or Phillips.  And they --

4    they -- Ned -- planned to set up a meeting with Ned, and Ned

5    met with the booster.  And he actually sold him the Norelco

6    razors.

7    **Q.**   So once -- how was that meeting set up?

8    **A.**   So the drug user or booster would contact -- contacted

9    Ned in this case, and said, hey, I've got this particular

10   item.

11   **Q.**   Was that phone conversation recorded?

12   **A.**   It was recorded.

13   **Q.**   Okay.  And then the confidential informant and the

14   defendant met at Cross Lanes at Speedway?

15   **A.**   They did.

16   **Q.**   And did the undercover officer take the CI there?

17   **A.**   Yes.  An undercover officer drove the CI to the meeting

18   spot, and the confidential informant got out of the car and

19   got into the black BMW driven by the defendant.

20   **Q.**   And during that controlled sale, did the confidential

21   informant receive $40 in cash?

22   **A.**   He did.

23   **Q.**   Were the items that he sold to the defendant new?

24   **A.**   They were.

25   **Q.**   And is $40 well below the retail value?

HEDRICK - DIRECT

1    **A.**    Yes.  I believe the true value of those electric razors

2    were over $100.  I don't remember the exact value.

3    **Q.**    Did the confidential informant leave the vehicle and

4    return to the undercover officer at that time?

5    **A.**    He did.

6    **Q.**    Did the confidential informant give the money to an

7    undercover officer?

8    **A.**    He did.  He gave the cash that the suspect -- or the

9    defendant had paid him, and then they debriefed the

10   confidential informant.  And that was the end of that

11   transaction.

12   **Q.**    Did the electric razors, similar or the same as what

13   was sold to the defendant, appear on eBay a couple days

14   later for $85?

15   **A.**    They did.

16   **Q.**    And is that controlled purchase recorded?

17   **A.**    It is.

18   **Q.**    And do you have pictures as well?

19   **A.**    We do.

20   **Q.**    Moving on to the second controlled sale.  What happened

21   on January 28th, 2020?

22   **A.**    On the 28th, the undercover officer that had driven the

23   CI on the 23rd had called the defendant and stated that he

24   had some items that he wanted to sell to the defendant.

25   **Q.**    Did he have a Ring doorbell?

HEDRICK - DIRECT

1   **A.**   It was a Ring doorbell, yes.

2   **Q.**   And did the undercover officer state that he knew John

3   who was a CI from the prior controlled sale?

4   **A.**   Yes.  That's how -- when he made the call, he stated

5   that he was a friend of John's, and that he wanted to make

6   some money, as well.  The undercover officer made that

7   statement.

8   **Q.**   Is that call recorded as well?

9   **A.**   It is.

10  **Q.**   Okay.  What happened after the call?

11  **A.**   So they met at the Cross Lanes Speedway.  And Ned

12  arranged a time.  And the undercover officer met Ned at the

13  Cross Lanes Speedway; got into the black BMW, and he had

14  made the -- had sold the Ring doorbell to Ned.

15  **Q.**   When the undercover officer produced the item to the

16  defendant, did he ask -- did he say he didn't know how much

17  he could get for it?

18  **A.**   Correct.

19  **Q.**   And what did the defendant do after that?

20  **A.**   The defendant actually looked on his mobile device and

21  looked up the product and gave a value of the product.

22  **Q.**   Did the undercover officer then state that he wanted to

23  make more money and asked what the defendant needed?

24  **A.**   Yes.

25  **Q.**   What was the defendant's response?

HEDRICK - DIRECT

1    **A.**   The defendant replied that Apple products, like Apple

2    iPad Pros, were -- were an item that he could use.

3    **Q.**   And did defendant state that, essentially, the more

4    expensive the item, the more money he would give?

5    **A.**   Yes.  The more expensive the item you bring me, the

6    more money you will make.

7    **Q.**   Did a Ring doorbell appear on the defendant's eBay

8    account a couple days later for $69?

9    **A.**   It did.

10   **Q.**   Is this controlled purchase recorded?

11   **A.**   It is.

12   **Q.**   All right.  Can you explain what happened in a third

13   controlled purchase on January 29, 2020?

14   **A.**   The same undercover officer had reached out to the

15   defendant again on a phone call and stated that he had an

16   item -- and I believe it was electric toothbrushes from

17   CVS -- that he thought the values were over $100.  And he

18   wanted to sell them to the defendant.

19   **Q.**   Was that initial call recorded as well?

20   **A.**   That -- yes, that call was recorded.  Yes.

21   **Q.**   What happened after the call?

22   **A.**   So they met -- the undercover officer met the defendant

23   at the Cross Lanes Speedway.  He got in the car with the

24   defendant.  And then on this particular, I guess, deal, the

25   defendant became suspicious of the undercover officer and

1    his phone.  So the defendant actually got -- grabbed the

2    phone from the undercover officer and started looking at the

3    transaction, where -- the call history, the texts or

4    different calls, texts, on his activity or applications on

5    the phone.

6    **Q.**   Did the defendant actually go through and shut down

7    the -- the running apps on the phone?

8    **A.**   He did.  So by doing that, I guess he cleared out the

9    applications and history, which cancelled out the recording

10   of that particular controlled buy.

11   **Q.**   When the undercover officer entered the vehicle, did he

12   state that he got the toothbrushes from CVS, and that the

13   tag on the shelf of the store said they sold for $150?

14   **A.**   Correct.

15   **Q.**   Did the defendant express reservation about purchasing

16   these toothbrushes because they did not sell for a very high

17   price on eBay?

18   **A.**   He did.

19   **Q.**   Did the defendant still go through with the

20   transaction?

21   **A.**   He did.

22   **Q.**   And did he pay $30 cash for the toothbrushes?

23   **A.**   He did.

24   **Q.**   And did similar items appear on the defendant's eBay

25   account several days later?

1   **A.**   They did.

2   **Q.**   How does the defendant know that these items are

3   stolen?

4   **A.**   Well, a few different things.  He never asked for the

5   receipt of the actual value of the products that he was

6   purchasing.  He clearly purchased them for well under the

7   actual value of the product, but then turned around and was

8   selling them for a much higher value.

9   **Q.**   And does he work with a certain type of person?

10  **A.**   Yes.  And these particular boosters are all drug users

11  who are desperate for quick cash.

12  **Q.**   Are they the type of people that can afford to buy

13  items at retail value and then sell them at 10 to 40 percent

14  of the value?

15  **A.**   They are not.

16  **Q.**   Did these boosters also receive lists of items that the

17  defendant wants?

18  **A.**   They do.

19  **Q.**   When the defendant posts an item on eBay, is he

20  representing that the item is not stolen?

21  **A.**   EBay requires -- or does not allow stolen items to be

22  sold on their accounts.  So, by selling them, he's saying

23  that they are not stolen.

24  **Q.**   And why would purchasers on eBay not want to purchase

25  stolen items?

HEDRICK - DIRECT

1   **A.**   Well, certainly it's illegal to purchase stolen items.

2   **Q.**   And from a property perspective, did they receive a

3   clear title of that item?

4   **A.**   They do not.

5   **Q.**   Was a financial investigation also conducted into the

6   defendant?

7   **A.**   It was.

8   **Q.**   And do we have records of two accounts at City National

9   and one account at Chase Bank?

10   **A.**   We do.

11   **Q.**   Is the account ending in 8889 an account that receives

12   money transferred from Pay Pal?

13   **A.**   It is.

14   **Q.**   Is the money that is in the Pay Pal account the

15   proceeds of a fraud scheme?

16   **A.**   It is.

17   **Q.**   And from December 8th, 2017, to November 15, 2019, did

18   -- were you able to determine that there were $263,000 worth

19   of transfers from Pay Pal to his account ending in 8889?

20   **A.**   We did.

21   **Q.**   Does the defendant withdraw a significant amount of

22   cash from that account?

23   **A.**   He did.

24   **Q.**   Based on your investigation, what does he use the cash

25   for?

1    **A.**   He uses that cash -- that's the cash he uses to pay the

2    boosters or the drug users for the items that they bring

3    him.

4    **Q.**   Looking at the -- did you also analyze a second account

5    from City National ending in 4623?

6    **A.**   We did.

7    **Q.**   And does the defendant transfer money from his other

8    account at City National into this second account?

9    **A.**   He did.

10   **Q.**   Is the money from the first account, does that

11   constitute proceeds of the fraud scheme?

12   **A.**   It does.

13   **Q.**   And were there -- were you able to analyze that there

14   were approximately $272,000 worth of deposits from that main

15   account?

16   **A.**   We did.

17   **Q.**   On July 8th, 2019, did you see a transfer back to the

18   account, the main account ending in 8889?

19   **A.**   We did.

20   **Q.**   Was that transfer for $155,000?

21   **A.**   Correct, 155,000-and-some-odd dollars.

22   **Q.**   Did the defendant then write a check to himself in that

23   amount?

24   **A.**   He did.

25   **Q.**   Did the defendant then deposit the $155,000 check into

1    the Chase account ending in 8197?

2    **A.**   He did.

3    **Q.**   On July 23rd, 2019, did the defendant conduct a foreign

4    transaction?

5    **A.**   He did.  He wired that -- or he deposited that money

6    from Chase into a bank in Bulgaria.

7    **Q.**   Was that a transfer of $150,000?

8    **A.**   It was 150-plus-thousand-some-odd dollars.

9    **Q.**   Are these banks FDIC insured?

10   **A.**   They are.

11           MR. TESSMAN:  No further questions, Your Honor.

12           THE COURT:  Ms. Zimarowski, any cross?

13           MS. ZIMAROWSKI:  Yes, Your Honor.

14   Just a moment, Your Honor.

15           THE COURT:  All right.

16   (Pause.)

17           MS. ZIMAROWSKI:  Just for the record, Your Honor,

18   I had asked Mr. Tessman for any prior statements that I

19   would be entitled to under Rule 5.1.  I believe he has

20   provided me with a number of statements, so I won't

21   reiterate that today.

22           THE COURT:  All right.

23                         **CROSS-EXAMINATION**

24   **BY MS. ZIMAROWSKI:**

25   **Q.**   Can you tell me one more time when this investigation

HEDRICK - CROSS

1    began?

2    **A.**    It was December of 2018, approximately.

3    **Q.**    And it was initially put together by state officials?

4    **A.**    It began with the retail investigators with Target,

5    CVS, and Kroger's.

6    **Q.**    Is that a separate law enforcement agency?

7    **A.**    Negative.  No.  They are investigators for the

8    companies themselves.

9    **Q.**    Okay.  And they work together?

10   **A.**    They do work together, at times.

11   **Q.**    You used the terms "Boosters."  Where did that come

12   from?

13   **A.**    Boosters?

14   **Q.**    Yes.  Mm-hmm.

15   **A.**    It's a common name used for these type of fraud cases.

16   **Q.**    Did you ever hear my client use the term "Boosters"?

17   **A.**    No.

18   **Q.**    Is that what the individuals called themselves?

19   **A.**    That's what -- again, it's just a term used from the

20   investigators from similar type of schemes in the past.

21   **Q.**    Okay.  So that's a law enforcement term?

22   **A.**    Correct.

23   **Q.**    And you testified that there are about 15 to 20

24   boosters ?

25   **A.**    That is from the boosters themselves that said there is

HEDRICK - CROSS

1    approximately that many people used.

2    **Q.**   And these are all individuals who sat down with

3    somebody from law enforcement and said that they were

4    planning on selling it to Ned?

5    **A.**   Yes, some of them that were arrested under, say, a

6    shoplifting case, whether it be, Target or CVS.

7    **Q.**   Was it always people who had gotten in trouble?

8    **A.**   Yes.

9    **Q.**   Always people who had gotten caught shoplifting?

10   **A.**   Correct.

11   **Q.**   And they said that they intended to sell it to Ned --

12   sell whatever items they stole to Ned?

13   **A.**   Yes.

14   **Q.**   Did any of them say that Ned knew that the items were

15   stolen?

16   **A.**   Not that I know of.

17   **Q.**   Did anyone say that they told Ned that the items were

18   stolen?

19   **A.**   None that I know of.

20   **Q.**   You testified that the evidence that he knew the items

21   were stolen was that he didn't ask for a receipt, that the

22   items were clearly purchased and sold at different values

23   than they should have been, and the type of people that were

24   working as boosters; is that right?

25   **A.**   Correct.

HEDRICK - CROSS

1    **Q.**   Is that all the evidence you have that he knew the

2    items were stolen?

3    **A.**   To -- well, the investigation is still going on, but to

4    this -- at this time, yes.

5    **Q.**   And then the controlled purchases you testified about,

6    and even the last one where the cop was there, nobody ever

7    said that the items were stolen, did they?

8    **A.**   No.

9    **Q.**   When you testified that you were able to match up

10   stolen items with items that were listed on his eBay

11   profile, did you actually match serial numbers?

12   **A.**   No.  That's from monitoring the sales account, so it

13   was not serial numbers, but, say, like, in this case, if it

14   was a Norelco razor, within a day or two, a Norelco razor

15   was sold by the defendant.

16   **Q.**   So the stores would send reports of the items that had

17   recently been stolen from them?

18   **A.**   Say that again.

19   **Q.**   Did the stores tell you what items had been shoplifted?

20   **A.**   The -- the corporate, the retail investigators, they

21   would match their products -- say it was from Target -- if

22   it was a Target product versus a CVS product or if it was

23   some other product from another location.

24   **Q.**   Okay.  So it was the retail investigators that matched

25   up the items with the eBay account?

HEDRICK - CROSS

1   **A.**   Well, in this case, law enforcement had watched by that

2   time, as well, and would correlate the recent -- if it was a

3   product -- say, in the controlled buy, if it was the product

4   in the controlled buy; they were sold by the defendant

5   within two days of the time that he purchased the product.

6   **Q.**   Okay.  So did you ever match things up that had been

7   stolen that you did not know who had actually stolen them?

8   **A.**   I haven't, no.

9   **Q.**   Do you have any idea the number of items that you were

10   able to match up as even definitively stolen, I suppose you

11   could say?

12   **A.**   No.  So of all the products that have been sold, I

13   can't say a definitive number were stolen.

14   **Q.**   You testified that you were conducting surveillance on

15   him, correct?

16   **A.**   Yes.

17   **Q.**   Okay.  You saw him go to post offices; saw him go to

18   stores?

19   **A.**   Meet with the -- to make the purchase -- to purchase

20   products from these boosters, yes.

21   **Q.**   Is that not something running a legitimate eBay

22   business would do?

23   **A.**   So -- I don't know any legitimate eBay sellers

24   personally, so I don't know.  What I would assume, they

25   wouldn't be texting a host of drug users and requesting

HEDRICK - CROSS

1    product, and purchase them at a lower price and then selling

2    them for a profit.

3    **Q.**   Well, you are trying to make money at an eBay store;

4    you would purchase something for a lower price than you sell

5    it for, right?

6    **A.**   Well, of course.

7    **Q.**   And there are a number of people that sell items on

8    eBay for a profit that aren't breaking the law?

9    **A.**   Correct.

10   **Q.**   So when you say you don't know any legitimate eBay

11   businesses, what do you mean?

12   **A.**   I personally -- personally, I do not know anyone who

13   makes a living selling on eBay.

14   **Q.**   If Ned did not know the items were stolen, would he be

15   guilty of this offense?

16   **A.**   Say that again.

17   **Q.**   If Ned didn't know that the items he sold were stolen,

18   would it count as money laundering?

19          MR. TESSMAN:  Your Honor, I would object.  That

20   calls for a legal conclusion.

21          THE COURT:  Sustained.

22   BY MS. ZIMAROWSKI:

23   **Q.**   You said that he warranted that the items weren't

24   stolen when he sold them on eBay; is that right?

25   **A.**   Say that again.

HEDRICK - CROSS

1   **Q.**   Okay.  So that 15 to 20 boosters, do you know how many

2   interviews were conducted of those boosters?

3   **A.**   I know at least four or five were interviewed after

4   they were arrested.

5   **Q.**   And you said they were all drug users?

6   **A.**   Known drug users, yes.

7   **Q.**   When you say "Known drug users," do you mean if they've

8   been arrested before?

9   **A.**   That they've been arrested for?

10  **Q.**   For drugs?

11  **A.**   Yeah, they were identified as drug users.

12  **Q.**   By who?

13  **A.**   Whether it would be the investigator, their local law

14  enforcement who come in and do the report afterwards.

15  **Q.**   They would say, "I recognize that person.  They are a

16  drug user"?

17  **A.**   They were known to be -- to use drugs, yes.

18  **Q.**   By having convictions for drugs or just -- (inaudible)

19  -- knowing?

20  **A.**   Of all the boosters -- I don't know their actual

21  criminal history, no.

22  **Q.**   So it would be an individual law enforcement would

23  review it, say, "I recognize this person.  They are a drug

24  user"?

25  **A.**   Correct, in some of these cases, yes.

1   **Q.**   Okay.  So not necessarily people who have been charged

2   with drugs before?

3   **A.**   Again, I don't know their criminal histories on all

4   these boosters.

5   **Q.**   But you know that they are drug users?

6   **A.**   I was told that they were drug users.

7   **Q.**   By the local law enforcement agency?

8   **A.**   Correct.

9   **Q.**   Shoplifters, too, right?

10  **A.**   Some of them.

11  **Q.**   And they identified Ned.  Were those people charged

12  with shoplifting once they identified Ned?

13  **A.**   That I don't know.

14  **Q.**   Do you have any idea how many of them were charged with

15  shoplifting?

16  **A.**   I do not.

17  **Q.**   You seized funds from Mr. Vladimirov's accounts; is

18  that right?

19  **A.**   We served seizure warrants on three accounts.

20  **Q.**   Are those accounts frozen now?

21  **A.**   Once they were served, they'll -- they'll be frozen

22  until the funds are sent to the -- to our office, actually,

23  to our agency.

24  **Q.**   And you searched his home?

25  **A.**   We did.

1   **Q.**   I received a copy of the search warrant affidavit.  Do

2   you know of any items of -- evidentiary items that were

3   located within the home?

4   **A.**   There were several packaged products.  We are still

5   going through them as we speak.  But there was several

6   packaged products, and we are still trying to locate where

7   they all came from.

8   **Q.**   And what kind of packaged products?

9   **A.**   Household goods -- there was -- without looking at the

10  inventory list, I couldn't even try to tell you.

11  **Q.**   Did you seize any firearms from the home when you

12  conducted the search?

13  **A.**   There were some firearms at the house.

14  **Q.**   Do you know if they were seized?

15  **A.**   No, they were not seized.  We checked to see -- we

16  checked to see if any of them were stolen.  They came back

17  not stolen, so we left the firearms there.

18  **Q.**   Is there any way to check the serial numbers of the

19  merchandise to determine whether it's stolen?

20  **A.**   Yes.  That's -- there is at least -- maybe, two- to-

21  three-hundred items on the inventory list that we have to go

22  through.

23  **Q.**   So when you were talking about the retail organization

24  matching up stuff that had been stolen with stuff that was

25  on eBay, could theoretically you look at the serial numbers

HEDRICK - CROSS

1   and determine whether that's actually the same item?

2   **A.**   No, from -- the same item as what?

3   **Q.**   That had been stolen?

4   **A.**   Eventually, we'll be able to go through some serial

5   numbers.  Some of them possibly could come back as stolen;

6   some may not.

7   **Q.**   Okay.  But right now all you know is certain items were

8   reported stolen and then similar or the same items were sold

9   in the store?

10   **A.**   All I -- I guess all I do know is I've got 200 to 300

11   items that I got to go through.

12   **Q.**   Okay.  Have you subpoenaed Mr. Vladimirov's tax

13   records?

14   **A.**   We have not.

15   **Q.**   So you don't know if he reported this income?

16   **A.**   We received copies -- while we were doing the search

17   warrant, we came across copies of -- I believe it was the

18   last couple years of some tax documents.  We didn't seize

19   them.  We did take some photos of them to -- to compare what

20   he maybe had claimed versus what the funds show in the bank.

21   There is still some financial analysis that needs to be

22   done.

23   **Q.**   And when you arrested Mr. Vladimirov, you took him down

24   to the station, right?

25   **A.**   Yes.  A couple agents took him in for processing.

1    **Q.**   And he made a statement?

2    **A.**   They did speak to him, yes.

3    **Q.**   Okay.  Do you know what he said?

4    **A.**    In general.  I don't know the details.  But it was, in

5    general, to the fact that he -- he sells items online as a

6    legitimate business; that's what he does for a living.

7    **Q.**   Were you able to get copies of any of the text messages

8    that were allegedly sent to the boosters?

9    **A.**   We have not.  There was a phone on his person that we

10   are working on getting a search warrant for the phone and

11   the contents of the phone.

12   **Q.**   Did anyone tell you that they had gotten the list of

13   items any other way other than through texts?

14   **A.**    It could be through phone calls, through texts.  I

15   don't know the details of how they provided the list.  How

16   the boosters received the list, I couldn't tell you exactly

17   how, whether it was text, through a phone call request.

18   **Q.**   Okay.  Did you seize the 2004 BMW?

19   **A.**   We did not.

20   **Q.**   To your knowledge, does Mr. Vladimirov have any money

21   that hasn't been seized or frozen?

22   **A.**   We are still looking into that.

23   **Q.**   Okay.

24   **A.**   I don't know if there is other bank accounts or funds

25   elsewhere.  We are still trying to determine that.

1   **Q.**   But everything you knew about, did you freeze or try to

2   take?

3   **A.**   We -- again, we had the three seizure bank accounts for

4   three accounts at two banks.

5   **Q.**   You talked about a transfer to a Bulgarian bank?

6   **A.**   Correct.

7   **Q.**   What date was that, again?

8   **A.**   It was in July of 2019.  I believe, like, maybe the

9   25th -- 27th -- I don't have my notes, so I couldn't tell

10  you the exact date.

11  **Q.**   Did you follow that money any further?

12  **A.**   We know that the -- I believe it was around $153,000

13  back in July that was transferred into that account in

14  Bulgaria, and I don't know anything further than that.

15  **Q.**   Are you guys able to freeze money in Bulgaria?

16  **A.**   No.

17  **Q.**   Okay.  You said that the bank account constitutes

18  proceeds of the fraudulent scheme, but you testified that

19  you don't know what percentage would actually have been

20  derived from an unlawful activity; is that right?

21  **A.**   That's right.

22  **Q.**   You know that English is Mr. Vladimirov's second

23  language?

24  **A.**   I don't -- I don't know the background.

25  **Q.**   But you do know that he was made a citizen in 2003,

1    right?

2    **A.**   2003-2004 timeframe, yes.

3         MS. ZIMAROWSKI:  Okay.  I think that's all I have,

4    Your Honor.

5         THE COURT:  Mr. Tessman, any redirect?

6         MR. TESSMAN:  Just very briefly, Your Honor.

7                    **REDIRECT EXAMINATION**

8    **BY MR. TESSMAN:**

9    **Q.**   Mr. Hedrick, who did the majority of the legwork on the

10   long-term investigation?

11   **A.**   It would be the retail investigators and the local law

12   enforcement investigators.

13   **Q.**   And then how did you get up to speed on it?

14   **A.**   I came up to speed on the back end, when we were

15   contacted by the local law enforcement.

16   **Q.**   So you weren't involved on the ground when everybody

17   was getting apprehended?

18   **A.**   No.  That's what -- yeah.  I was not with -- as far as

19   the shoplifters and the drug users and the boosters.

20   **Q.**   And so you've learned that information from officer

21   reports and speaking to those officers, right?

22   **A.**   Correct.

23   **Q.**   Okay.  How many items, retail items were recovered from

24   the defendant's house?

25   **A.**   It was between -- throughout, to the defense -- between

1    200 and 300 items.

2    **Q.**   And those --

3    **A.**   And I don't have the inventory list to give you the

4    exact number.

5    **Q.**   Okay.  Was there anything else of interest that was

6    recovered from the defendant's house?

7    **A.**   We are still going through the items, but, again, just

8    packaged items.  I don't know what all we received at the

9    time.  I mean, I don't really know what all we have.

10   **Q.**   Does the defendant have legitimate employment other

11   than his eBay activity?

12   **A.**   No.  As far as I know, he -- he had one time worked for

13   Fed-Ex, and then he was no longer working with them.

14   **Q.**   Based on the tax information that you did receive

15   during the search, does it look like the defendant is

16   reporting all of his eBay sales on his taxes?

17   **A.**   It does not.  They don't match up.

18          MR. TESSMAN:  I have no further questions.

19          THE COURT:  Any recross, Ms. Zimarowski?

20          MS. ZIMAROWSKI:  Just real quick, Your Honor.

21                    **RECROSS EXAMINATION**

22   **BY MS. ZIMAROWSKI:**

23   **Q.**   You said they don't match up.  What do you mean?

24   **A.**   The numbers that he reported as income and the number

25   of the sales that he made on eBay, they don't match up.

HEDRICK - RECROSS

1    **Q.**   Is it like a big difference or --

2    **A.**   Well, I haven't looked at it today.  There is a large

3    difference.

4    **Q.**   It was enough that you noticed it?

5    **A.**   Correct.

6    **Q.**   Okay.  You said that the retail investigators did the

7    majority of the legwork?

8    **A.**   Early on, yes.

9    **Q.**   Because they were the ones that actually talked to the

10   boosters?

11   **A.**   They -- yeah, the retail investigators, they initiated

12   this, the investigation, due to similar names -- similar

13   people getting arrested in approximate locations affecting

14   their stores, and then they in turn contacted the South

15   Charleston Police Department and the Putnam County Sheriff's

16   Office.

17   **Q.**   Do you know about how many retail investigators there

18   are?

19   **A.**   I know of three on this case, three retail

20   investigators, and the rest are law enforcement.

21   **Q.**   And is each investigator assigned to a store?

22   **A.**   I know there was one retail investigator representing

23   Target, one representing CVS, and one representing the

24   Kroger Company.

25   **Q.**   And do you know if those investigators were personally

1    involved in each interview of an alleged booster?

2    **A.**   I do not.

3    **Q.**   Do you know if they recorded their interviews with the

4    boosters?

5    **A.**   I do not.

6    **Q.**   And you testified that there were a number of packaged

7    items in Mr. Vladimirov's home --

8    **A.**   Correct.

9    **Q.**   -- when you conducted the search warrant?  As we sit

10   here today, you haven't been able to confirm that any of

11   those items were stolen?

12   **A.**   I have not.

13   **Q.**   And as we sit here today, you haven't found any

14   communications directly between Mr. Vladimirov and the

15   alleged boosters?

16   **A.**   No.  Not until we have a signed search warrant.

17   **Q.**   Well, you have a signed search warrant?

18   **A.**   For the phone.  The phone off his person, we'll do a

19   separate search warrant.

20   **Q.**   So you haven't applied for that yet?

21   **A.**   No.  We are working on the draft right now.

22   **Q.**   Okay.  This is really for Mr. Vladimirov's benefit.

23   Did you lock up the house when you left?

24   **A.**   We did.  We did.  We put the keys on the kitchen table

25   and we made sure both -- all the doors and the garage was

HEDRICK - RECROSS

1    locked.

2    **Q.**   Thank you.

3    **A.**   You're welcome.  Along with a copy of the search

4    warrant and inventory list as well.

5    **Q.**   Okay.  Be sure to look for that.

6             MS. ZIMAROWSKI:  All right.  No further questions,

7    Your Honor.

8             THE COURT:  Mr. Tessman, anything further?

9             MR. TESSMAN:  No, Your Honor.

10            THE COURT:  May this witness step down?

11            MR. TESSMAN:  Yes, Your Honor.

12            THE COURT:  Agent Hedrick, you may step down.

13   Thank you, sir.

14       Mr. Tessman, does the United States have any other

15   witnesses?

16            MR. TESSMAN:  No, Your Honor.

17            THE COURT:  All right.  Ms. Zimarowski, does the

18   defendant have any witnesses?

19            MS. ZIMAROWSKI:  No, Your Honor.

20            THE COURT:  All right.  Based upon the testimony

21   presented, the Court finds probable cause to believe that

22   the defendant committed the violations as charged in the

23   Complaint, that is, a violation of Title 18, United States

24   Code, Section 1956(a)(1)(A), and 18, United States Code,

25   Section 1957(a).

1          It is hereby ordered that the defendant shall appear

2    for further proceedings in this matter at a later time.

3          We will now move to the detention hearing.

4          Have the parties had an opportunity to review the

5    Pretrial Services Report?

6              MR. TESSMAN:  Yes, Your Honor.

7              MS. ZIMAROWSKI:  Yes, Your Honor.

8              THE COURT:  Are there any additions or corrections

9    that need to be made to the Pretrial Services Report on the

10   record this afternoon?

11        Mr. Tessman?

12             MR. TESSMAN:  Your Honor, the only thing we would

13   raise is one of the same things that was raised in Mr.

14   Hedrick's testimony, and that is, that we have evidence of a

15   $150,000 transfer to Bulgaria in July of 2019, and I think

16   the defendant failed to mention that to the probation

17   officer.

18             THE COURT:  All right.

19        Ms. Zimarowski?

20             MS. ZIMAROWSKI:  Your Honor, obviously, I haven't

21   seen records related to that yet, but I don't even know what

22   Mr. Tessman means when he says failed to disclose --

23             THE COURT:  Well, first, let me ask you a

24   question.

25             MS. ZIMAROWSKI:  Okay.

USA v VLADIMIROV

```
1              THE COURT:  Are there any additions or corrections
2    to make to the report?
3              MS. ZIMAROWSKI:  No, Your Honor.
4              THE COURT:  Okay.  Now, you can go ahead.
5              MS. ZIMAROWSKI:  I don't believe -- and actually,
6    Mr. Vladimirov invoked his right to remain silent in terms
7    of discussing his financial profile.  So he wasn't
8    concealing anything specifically from the probation officer
9    about a transfer to Bulgaria.  He did not answer any
10   financial questions whatsoever.
11             THE COURT:  All right.
12             MS. ZIMAROWSKI:  Thank you.
13             THE COURT:  Both statements by counsel for the
14   United States and the defendant on that issue will be so
15   noted.
16        The United States has filed a motion for detention
17   hearing and did not invoke the rebuttable presumption, I do
18   not believe.  However, we need to go forward on the
19   detention hearing if we are going to have one.
20        And, Ms. Zimarowski, is the defendant contesting
21   detention at this time?
22             MS. ZIMAROWSKI:  Yes, Your Honor.
23             THE COURT:  All right.  Mr. Tessman, how would you
24   like to proceed?
25             MR. TESSMAN:  Your Honor, I would like to call
```

1    Probation Officer Patrick Fidler to the stand.

2             THE COURT:  You mean Justin Gibson?

3             MR. TESSMAN:  Justin Gibson.  Sorry, sir.

4             THE COURT:  All right.  Mr. Gibson, if you'd come

5    forward and be sworn.

6         **JUSTIN GIBSON, GOVERNMENT'S WITNESS, SWORN**

7                    **DIRECT EXAMINATION**

8    **BY MR. TESSMAN:**

9    **Q.**   Good afternoon, Mr. Gibson.

10   **A.**   Good afternoon.

11   **Q.**   What do you do for a living?

12   **A.**   I am a United States Probation Officer in the Southern

13   District of West Virginia.

14   **Q.**   How long have you been working in that capacity?

15   **A.**   Since 2011.

16   **Q.**   Did you prepare a report concerning this case?

17   **A.**   I did.

18   **Q.**   And how did you prepare that report?

19   **A.**   Based on an interview with Mr. Vladimirov, the

20   defendant, along with some other records that we were able

21   to obtain.

22   **Q.**   And were you able to determine if the defendant had a

23   strong connection to this district?

24   **A.**   During my interview with Mr. Vladimirov, he indicated

25   that his -- some of his family members, his ex-wife and

1   young son lived in South Carolina, but that he was from

2   Bulgaria.  He was unable to provide any contact information

3   for a neighbor or a friend or anything along those lines

4   that I could speak with.

5   **Q.**   Why is that problematic?

6   **A.**   It's difficult for us to determine whether or not the

7   information he provided is reliable or not.

8   **Q.**   Does the defendant maintain dual citizenship?

9   **A.**   It's my understanding, yes.

10  **Q.**   Does the defendant have a recent trip to Bulgaria?

11  **A.**   He indicated that he took a trip to Bulgaria in 2019.

12  **Q.**   Does he travel internationally frequently?

13  **A.**   We didn't go into his entire history of travel to and

14  from the United States, but he indicated that he had

15  traveled to -- in addition to Bulgaria in 2019, he had

16  traveled to Spain and Germany in 2017.

17  **Q.**   Were you able to determine whether or not the defendant

18  has employment other than his eBay activity?

19  **A.**   I was not.

20  **Q.**   Were you able to research the defendant's criminal

21  history?

22  **A.**   Yes .

23  **Q.**   And what did you find?

24  **A.**   There were a couple charges in Utah.  I was unable to

25  determine the circumstances regarding those charges other

1    than that they were made part of his criminal record.  And

2    he had, I believe, a misdemeanor charge here in Kanawha

3    County previously.

4    **Q.**    Does the defendant have significant foreign ties?

5    **A.**    To the best of my knowledge, yes.

6    **Q.**    Does he have family in Bulgaria?

7    **A.**    It's my understanding, yes.

8    **Q.**    How long has the defendant been a resident of this

9    district?

10   **A.**    Roughly, eight years.  I believe it was 2012 when he

11   moved to Cross Lanes, West Virginia.

12            MR. TESSMAN:  I have no further questions, Your

13   Honor.

14            THE COURT:  Ms. Zimarowski, any cross of this

15   witness?

16                         **CROSS-EXAMINATION**

17   **BY MS. ZIMAROWSKI:**

18   **Q.**    So you were unable to get any of the actual complaints

19   with the criminal history charges that are listed in the

20   Pretrial Services Report?

21   **A.**    That's correct.

22   **Q.**    Were you able to get any documentation at all?

23   **A.**    No.  I requested that information -- are you talking

24   about the Utah charges in particular?

25   **Q.**    Yes.

GIBSON - CROSS

1    **A.**    Yes, I requested the information from the pretrial

2    services office in the district of Utah, but, to date, I

3    have not received anything.

4    **Q.**    And both of the Utah charges happened back in 2003,

5    right?

6    **A.**    Yes.

7    **Q.**    And I'm not seeing on this document any indication that

8    he ever failed to appear for court?

9    **A.**    Not that I'm aware of, no.

10   **Q.**    And then the only Kanawha County charge looks like a

11   traffic offense that was dismissed; is that right?

12   **A.**    Correct.

13   **Q.**    So he has no criminal history to speak of?

14   **A.**    That I'm aware of.

15   **Q.**    Okay.  You testified that -- that he has significant

16   ties to Bulgaria; is that correct?

17   **A.**    Yes.

18   **Q.**    Okay.  Do you often take passports from defendants when

19   they are released on bond?

20   **A.**    If they are ordered to do so, yes.

21   **Q.**    Is there any reason you couldn't do so in this case?

22   **A.**    I don't see why not.

23   **Q.**    And if he gave you his passport, he wouldn't able to

24   travel to Bulgaria, would he?

25   **A.**    I can't answer that question.

1    **Q.**   He wouldn't be able to take a commercial flight to

2    Bulgaria?

3    **A.**   I'd say that's accurate.

4    **Q.**   There was something in the report actually about how

5    the residence was unverified.  But, since that time, I've

6    been given a search warrant affidavit that confirms that he

7    owns that home.  That was more of a statement than a

8    question.  I apologize.

9         Other than his dual citizenship, are there any other

10   reasons why he couldn't be placed on home confinement or any

11   number of conditions that could ensure that he stays here?

12   **A.**   To answer that generally, Mr. Vladimirov lives by

13   himself, to my knowledge.  While he's in custody, obviously,

14   we cannot verify his residence; we cannot verify his

15   employment; we cannot verify income.  In order to do that,

16   to place him on electronic monitoring, he would have to

17   obtain a landline in his residence, and, to my knowledge, he

18   does not have one.

19        There is a number of things that kind of prevent us

20   from verifying that information.

21   **Q.**   And the lack of verification, is that why you

22   recommended that he remain detained?

23   **A.**   That, in addition to his dual citizenship; again, lack

24   of verified income; lack of -- again, based on his

25   statements on his self-report, which is listed in the

1    Pretrial Services Report, we have no way to verify any

2    source of income other than his eBay transactions.

3    **Q.**    You could craft a condition that says he is not allowed

4    to participate in any eBay transactions, couldn't you?

5    **A.**    I'm not the judge.

6    **Q.**    You could ensure that he doesn't have Internet access

7    in the home?

8    **A.**    If he is so ordered to.  But in order to have a home,

9    you have to have an income that you can pay, and, again, we

10   don't have a way to verify any income or money that he has

11   coming in.

12   **Q.**    If you could, would you have recommended that he be

13   released?

14   **A.**    I can't answer that question.

15   **Q.**    You said that he would have to have a landline in order

16   to be electronically monitored.  Aren't there a couple of

17   cell devices?

18   **A.**    There are.  But, again, if the Court would order him to

19   pay for that, we would still have to verify income as well.

20   **Q.**    A lot of people that come before this Court don't have

21   jobs , right?

22   **A.**    Correct.

23   **Q.**    And they are still able to be released?

24   **A.**    Because they have ties to the community, most of the

25   time.

1   **Q.**   He could get another job, couldn't he?

2   **A.**   You'd have to ask your client.

3   **Q.**   All right.  Thank you.

4           MS. ZIMAROWSKI:  No further questions, Your Honor.

5           THE COURT:  Mr. Tessman, any redirect?

6           MR. TESSMAN:  Yes, Your Honor.

7                      **REDIRECT EXAMINATION**

8   **BY MR. TESSMAN:**

9   **Q.**   Mr. Gibson, will cutting off the defendant's Internet

10  access and his eBay activity assure his appearances at

11  future hearings?

12  **A.**   I don't know that I could answer that question or

13  guarantee that.

14  **Q.**   Is it fair to say that there are also downsides to

15  electronic monitoring of a defendant that -- what I'm trying

16  to say is, does electronic monitoring assure a defendant's

17  appearance at a hearing?

18  **A.**   No.

19  **Q.**   Why is that?

20  **A.**   If they have an ankle monitor strapped on or strapped

21  on anywhere on their body, they can cut it off and leave it

22  at the residence or throw it in the river.  So it doesn't

23  guarantee that they are going to appear in court, no.

24  **Q.**   Does taking someone's passport necessarily mean someone

25  won't flee?

GIBSON - RECROSS

1    **A.**    No.

2              MR. TESSMAN:  No further questions, Your Honor.

3              THE COURT:  Any recross, Ms. Zimarowski?

4                    **RECROSS EXAMINATION**

5    **BY MS. ZIMAROWSKI:**

6    **Q.**    If someone does cut off their bracelet and throw it in

7    the river, you would be notified immediately, right?

8    **A.**    It depends on, I believe, the type of monitoring.  If

9    it's RF -- let's say, landline monitoring, we may not be

10   notified immediately.  There may be a delay in that.  But,

11   again, it's -- we wouldn't be right at the residence at the

12   exact moment that it happens.

13   **Q.**    How long is the delay?

14   **A.**    I can't answer that.

15   **Q.**    Okay.  But eventually you would be notified?

16   **A.**    Yes.

17   **Q.**    Usually within a matter of minutes?

18   **A.**    I don't want to say exactly --

19   **Q.**    Depends on the system?

20   **A.**    -- but we will be notified, yes.

21   **Q.**    And once you're notified, you tell the marshals?

22   **A.**    Well, we would do an investigation.  I don't know that

23   it would be directly through the marshals, but we would do

24   an investigation.

25              MS. ZIMAROWSKI:  No further questions.

```
1              THE COURT:  Any further questions of this witness?

2              MR. TESSMAN:  No, Your Honor.

3              THE COURT:  Ms. Zimarowski?

4              MS. ZIMAROWSKI:  No, Your Honor.

5              THE COURT:  Mr. Gibson, you may step down.

6         Thank you, sir.

7         Mr. Tessman, do you have any other witnesses or any

8    other evidence to present?

9              MR. TESSMAN:  No, Your Honor.  But based on the

10   evidence presented, we would just argue that there are no

11   conditions --

12             THE COURT:  Before you get to that, do you have

13   any more evidence?

14             MR. TESSMAN:  No, Your Honor.

15             THE COURT:  Ms. Zimarowski, anything further from

16   the defendant?

17             MS. ZIMAROWSKI:  No, Your Honor.

18             THE COURT:  All right.  Now, Mr. Tessman, you can

19   make any arguments you want to make.

20             MR. TESSMAN:  Just very briefly, Your Honor.

21   It's the United States' position that there is no

22   conditions of release that will reasonably assure the

23   defendant's appearance.  He does not have legitimate

24   employment as far as we know.  He does not have a strong

25   connection to this district.  He travels frequently
```

1     internationally.  He may have other accounts out there that

2     we don't know about yet.  He may have money stashed in

3     different banks or different countries even.

4          I have nothing further to add, Your Honor.

5               THE COURT:  All right.

6          Ms. Zimarowski.

7               MS. ZIMAROWSKI:  Your Honor, it's our position

8     that there are conditions that can reasonably assure his

9     appearance as required:  Taking his passport, putting him on

10    electronically monitored home confinement, prohibiting him

11    from operating an eBay business.  You could even prohibit

12    him from being on the Internet at all.

13         He is willing to do essentially anything in order to

14    get home.  I note that he has a number of health conditions

15    that he's having issues with at the jail, including the fact

16    that he requires a C-Pap machine for his sleep apnea that he

17    hasn't been receiving.

18         Other than the fact he does have dual citizenship and

19    that he was born in another country, there is not much

20    difference between him and so many of the people that come

21    before us that don't have current legitimate employment that

22    are struggling financially.  And that is no reason to keep

23    him in custody, just simply because the Court believes he's

24    not going to be able to work.  And, again, it's difficult

25    for me to see how he would have -- how somebody who has

1    never been convicted of an offense before, who has never

2    failed to appear in court before, could possibly flee or

3    fail to appear if his passport is seized and if he is placed

4    on electronically monitored home confinement that would

5    alert probation if he even steps off of his driveway.

6         In short, there are simply conditions that can

7    reasonably assure his appearance as required, and that is

8    the standard that this Court is supposed to be evaluating,

9    whether a reasonable assurance if his appearance is

10   required.

11        The government sounds like from what the agent

12   testified to has seized most of his funds.  He still owns

13   his own home.  I've discussed with him about putting in a

14   landline or any number of other things.  And, quite simply,

15   he's willing to do whatever it takes.

16        And as the Court heard, it is his position that he did

17   not realize that these items were stolen.  And he looks

18   forward to exonerating himself.  And he has no incentive to

19   flee.

20        I also note that even the complaint taken at face

21   value, this is a fraudulent scheme that sounds large, but

22   the actual amount of time that he's facing under the United

23   States Sentencing Guidelines, it is not anything that would

24   make someone flee to Bulgaria.

25        He's looking at -- you know, even if the government

USA v VLADIMIROV

1    manages to prove all of the allegations in this case, he's

2    looking at a couple of years, because he has no criminal

3    history.

4         Again, he has every incentive to stay here and fight

5    these charges and appear in Court in order to exonerate

6    himself.

7         Thank you, Your Honor.

8              THE COURT:  Thank you, Ms. Zimarowski.

9         Anything further from the government?

10             MR. TESSMAN:  No, Your Honor.

11             THE COURT:  Well, the Court has considered the

12   arguments of counsel, the Court has considered the testimony

13   of the witness, and the Court has considered the factors

14   under Title 18, United States Code, Section 3142(g).

15        Based upon those things, the Court will make the

16   following findings:

17        First, this defendant is charged with a financial

18   crime, and that financial crime is promotion of money

19   laundering and engaging in monetary transactions in property

20   derived from specified unlawful activity.

21        It appears, based upon the testimony that has been

22   offered, that the defendant allegedly enlisted several drug

23   users to steal various items from various businesses that

24   the defendant eventually sold on eBay.

25        It appears that this defendant was born in Sofia,

1    Bulgaria, and became a naturalized United States citizen in

2    2003.  He maintains a dual citizenship with the United

3    States and Bulgaria.  He has traveled internationally to

4    Bulgaria in 2019, and to Spain and Germany in 2017, and that

5    he has a valid passport.

6         Since 2012, the defendant has lived in Cross Lanes,

7    West Virginia, here in the Southern District of West

8    Virginia.

9         The defendant has no family ties here and no community

10   ties here; items that the Court should consider in

11   determining whether defendant should be released on bond.

12        This defendant is self-employed, an eBay vendor, which

13   may be related -- or appears to be related to the nature of

14   these charges in this criminal complaint.

15        The Court will note that on the date of his initial

16   appearance, the defendant's drug screen was positive for

17   marijuana and benzodiazepines.  It does not appear that this

18   defendant has any significant criminal history, but he does

19   have two domestic violence emergency protection orders filed

20   here in Kanawha County in 2014.

21        So considering all those factors, in addition to what

22   the probation officer testified to in terms of his residence

23   at -- there has been no verification of his residence in

24   terms of him living there, no verification whether there is

25   any support from his neighbors or his friends or anything of

USA v VLADIMIROV

1    that nature, whether he has any knowledge of anyone that

2    lives in his neighborhood; the defendant has no income and

3    no job.  Those are factors that the Court has to consider as

4    to whether this defendant should be released on bond.

5         It appears that his occupation was the eBay account

6    which now has been terminated, I would suspect.  The

7    defendant has no landline in his home.  Even though counsel

8    indicated one could be installed, there is not one in his

9    home at this time.

10        The defendant had weapons in his home.  Even though

11   those weapons could be removed, he did have weapons in his

12   home, and they have not been removed as we sit here today.

13        It appears that this defendant has transferred large

14   sums of money to Bulgaria.  And it appears that this

15   defendant did obtain a lot of money based upon his eBay

16   account that he had.

17        So after considering all of those factors, the Court

18   finds by a preponderance of the evidence that the defendant

19   does pose a risk of nonappearance.

20        So for those reasons, it is the finding of the Court

21   that there are no condition or combination of conditions

22   that have been presented to the Court today for this

23   defendant to be released on bond.

24        Therefore, Mr. Vladimirov, you are going to be detained

25   and remanded to the custody of the United States Marshal

USA v VLADIMIROV

1     until further proceedings in this matter.

2          Is there anything further from counsel?

3               MR. TESSMAN:  No, Your Honor.

4               MS. ZIMAROWSKI:  No, Your Honor -- oh, actually,

5     could I ask the Court to release the criminal record that

6     was compiled by probation, the Pretrial Services Report?

7               THE COURT:  Yes, ma'am.

8          Mr. Gibson, if you could provide the defendant's

9     criminal history to counsel for the United States and

10    counsel for the defendant?

11              PROBATION OFFICER:  Yes, Your Honor.

12              THE COURT:  Anything further?

13              MR. TESSMAN:  No, Your Honor.

14              MS. ZIMAROWSKI:  No, Your Honor.

15              THE COURT:  If there is nothing further, we are

16    adjourned in this matter.  Thank you.

17              COURTROOM DEPUTY:  All rise.  This Court is

18    adjourned.

19         (Proceedings concluded.)

20

21

22

23

24

25

```
 1                       REPORTER'S CERTIFICATE

 2


 3          I, Catherine Schutte-Stant, Official Realtime Court

 4   Reporter of the United States District Court for the

 5   Southern District of West Virginia, do hereby certify that

 6   the foregoing proceedings, which were taken out of my

 7   presence, were transcribed by me from an audio-recording to

 8   the best of my ability, and said proceedings are a true and

 9   accurate transcript from my stenographic notes.  I further

10   certify that, pursuant to Section 753, Title 28, United

11   States Code, the foregoing is a true and correct transcript

12   of the stenographically reported proceedings held in the

13   above-entitled matter and that the transcript page format is

14   in conformance with the regulations of the Judicial

15   Conference of the United States.

16                       Date:  March 9, 2020

17

18

19

20          /s/ CATHERINE SCHUTTE-STANT, RDR, CRR
            _____
21          CATHERINE SCHUTTE-STANT, RDR, CRR
            FEDERAL OFFICIAL COURT REPORTER
22

23

24

25
```